IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JASON D. WANDICK,

                Plaintiff,

  v.

ANDREW WIERSMA and HEATHER SCHWENN,

                Defendants.[1]

OPINION and ORDER

24-cv-531-jdp

---

Plaintiff Jason D. Wandick, proceeding without counsel, is a prisoner currently incarcerated at Wisconsin Resource Center. Wandick alleges that when he was incarcerated at Columbia Correctional Institution, defendant staff did not properly respond to his statements that he was suicidal, leading him to attempt hanging himself and becoming seriously injured. I granted Wandick leave to proceed on claims under the Eighth Amendment to the United States Constitution. Dkt. 9. Defendants now move for summary judgment. Dkt. 26.[2] I will deny that motion because the parties dispute whether Wandick told them that he was suicidal, and because I conclude that defendants are not entitled to qualified immunity.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted. At the time of the incident in question, plaintiff Jason D. Wandick was incarcerated at Columbia Correctional Institution

---

[1] I have amended the caption to correct the spelling of defendants' names as reflected in their submissions.

[2] Defendants also moved for a two-day extension of time to file their summary judgment motion, Dkt. 25, which I will grant.

(CCI). Defendants worked at CCI: Andrew Wiersma was a sergeant and Heather Schwenn was a psychologist.

The incident in this case happened on July 31, 2023. At about 1:30 p.m., Wandick spoke to Wiersma at the sergeant's desk in the unit dayroom.[3] Wandick spoke with Wiersma again about five minutes later. Wandick states that in one of these encounters he told Wiersma "that he was depressed, dealing with a lot, ready to die and was going to hang himself." Dkt. 33, ¶ 16. Wiersma disputes this, saying that Wandick only stated that he wanted to see someone from the psychological services unit but he did not say that he was feeling suicidal.

Wiersma states that when an inmate tells him that he is suicidal, he typically alerts the psychological services unit and a supervisor, and he places the inmate in an "observation" cell until a psychological professional assesses the inmate. Wiersma states that in this case, because Wandick did not tell him that he was suicidal, he only contacted the psychological services unit. Several minutes after these encounters, Wandick returned to his cell.

Around this time, a sergeant told defendant Schwenn that Wandick had reported feeling depressed and had thoughts of hanging himself. Schwenn responded that she was already on her way to handle another "crisis call" but that she would speak with Wandick after she was finished. At 1:53 p.m. Schwenn came to the unit dayroom to speak with Wandick and another staff member went to get Wandick from his cell; that staff member returned without Wandick, saying that he was taking a shower. Wandick states that he was actually in his cell at this point, but it's undisputed that Schwenn didn't know this. Schwenn waited in the

---

[3] Video footage (without audio) of the dayroom and hallways shows most of the interactions discussed in this opinion, but that footage does not show what the parties said. Dkt. 29-1 (placeholder docket entry for this footage).

dayroom for about ten minutes before leaving, telling Wiersma to call her when Wandick was done with his shower. Schwenn states that she had multiple crisis calls that day so she could not wait longer.

Over the next couple of hours, Schwenn came to the dayroom twice but Wandick wasn't in his cell. At least one of these times Wandick was attending prescheduled law library time.

Schwenn and Wiersma came to Wandick's cell at about 4:37 p.m. and spoke with Wandick for about a minute for a suicide risk assessment. The parties dispute what was said during this interaction.

Schwenn says that Wandick denied feeling suicidal or having thoughts of self-harm but stated that he would like to come out of his cell to speak with Schwenn. Schwenn noted that Wandick's mood was calm, and his thought processes were logical. Wandick repeated that he wanted to come out of his cell and speak with Schwenn. Schwenn told him that he would have to submit a psychological services form to request a session with his assigned clinician. (Schwenn was not his assigned clinician at that time, so she would not have been the person Wandick would see in non-emergency situations.) Schwenn states that she could not take Wandick out of his cell to speak with him because staff were about to perform standing count.

Wandick disputes this account. According to Wandick, he told Schwenn that he was still suicidal. Schwenn told Wandick that Wiersma had informed her that Wandick wanted to hang himself; Schwenn asked Wandick if it was true and Wandick said yes. Schwenn asked why he was feeling that way. Wandick told Schwenn that he did not feel comfortable talking in front of the whole tier and asked to speak with her privately. Schwenn told Wandick, "No, if you want to talk fill out a green slip." Dkt. 34, ¶ 15. (A "green slip" is a psychological services form.) Wandick told Schwenn that he was going to hang himself and that he was ready to die.

3

His mood was emotional and his thought process was not clear. Schwenn replied, "I don't think you are Mr. Wandick you got into the shower and went to library, saying you are suicidal is not a tool used to get out of your cell!" *Id.*, ¶ 17. She again told him that if he wanted to talk he should fill out a psychological services form. Wandick told Schwenn, "At this point I am going to hang myself" while pointing to his bunk. *Id.*, ¶ 21. Wandick then looked to Wiersma, who said that he would give Wandick a psychological services form when he came out for dinner.

It is undisputed that Schwenn and Wiersma walked away from Wandick's cell after speaking with Wandick.

At 5:00 p.m., inmates started to move to the dayroom for dinner service. Wandick's cellmate Moore left the cell while Wandick stayed behind. At 5:22 p.m., Moore returned to the cell. The cell door was closed, so Moore asked the bubble officer to open the cell door. Moore walked into the cell for a moment and then went to get Wiersma, telling him that Wandick had a sheet around his neck.

Wiersma went to the cell and saw Wandick kneeling by his bunk in distress and making gagging sounds. Wiersma shouted at Wandick for a response. Wiersma immediately radioed for a supervisor and support staff to come to Wandick's cell for a suicide attempt and a possible noose around Wandick's neck. Under prison policy, staff were forbidden from entering a cell alone or without protective equipment. After about four minutes, a group of staff entered Wandick's cell and cut the sheet from the bed. (Wandick doesn't bring a claim about this delay). Wandick experienced a seizure-like episode for about two minutes. He was taken to a hospital emergency room.

4

Upon his return from the hospital, Wandick reported having difficulty saying what he was thinking. Over the last few years Wandick has been treated for expressive aphasia and he receives speech therapy. Aphasia can be caused by physical injury or psychological or emotional reasons. Imaging does not appear to show that Wandick suffered an injury to the part of the brain controlling speech, but some of his various diagnoses have suggested that Wandick's aphasia was indeed caused by a brain injury.

I will discuss additional facts as they are relevant to the analysis.

ANALYSIS

Wandick contends that defendants Wiersma and Schwenn failed to protect him from harming himself. This type of claim is governed by the Eighth Amendment, which prohibits prison officials from consciously disregarding a prisoner's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on his claim, Wandick must show four things: (1) there was a strong likelihood that Wandick would seriously harm himself; (2) defendants knew of a strong likelihood that he would seriously harm himself; (3) defendants consciously failed to take reasonable measures to prevent the harm; and (4) defendants' actions or inactions caused him harm. *See Lord v. Beahm*, 952 F.3d 902, 904–05 (7th Cir. 2020); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012); Federal Civil Jury Instructions of the Seventh Circuit § 7.19 (2017).

Defendants approach Wandick's claim from a slightly different perspective, that of an Eighth Amendment medical care claim. They concede that Wandick faced a serious medical need but contend that they did not consciously disregard that need because (1) Wiersma responded to Wandick's initial requests for help by seeking an assessment from Schwenn;

5

(2) Schwenn attempted to meet with Wandick but their schedules didn't match up; and (3) when Schwenn finally met with Wandick, Wandick denied that he was suicidal and otherwise appeared stable. This difference in approach doesn't materially alter the analysis because the case boils down to defendants' awareness of a true risk of harm and their responses to that risk. I will discuss each defendant in turn.

## A. Defendant Schwenn

I granted Wandick leave to proceed on an Eighth Amendment claim that Schwenn left him in his cell instead of taking other action to ensure that he wouldn't harm himself. Defendants contend that Schwenn didn't disregard Wandick's condition; rather she made repeated attempts to see him throughout the afternoon of the incident and then made a medical judgment in assessing Wandick once they did meet. Schwenn says that at this meeting Wandick disclaimed thoughts of suicide and that his demeanor was calm. And it is undisputed that Wandick engaged in other activities during the afternoon; Schwenn says that engaging in these "safety behaviors" indicates that he was probably not experiencing an emergency. Schwenn argues that her professional medical judgment in assessing Wandick's condition is owed deference that rules out a finding of conscious disregard on her part. "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

The problem for Schwenn is that her asserted medical judgment is based on her version of the events, which Wandick disputes. Contrary to Schwenn's version of events, Wandick states that he told Schwenn that he remained suicidal, that he was going to hang himself, and that he was ready to die. He also states that he was not calm during the encounter; rather he

6

was "emotional" and not thinking clearly. Wandick's cellmate and two other prisoners who were nearby on the tier provide roughly the same account of events. Dkts. 36–38. Schwenn states that had Wandick said that he was suicidal, she would have placed him in observation. But she did not do so. Instead she told Wandick to make a psychological services request to speak with his usual provider as if he faced no emergency. If a reasonable jury believed Wandick's version of events, it could conclude that Schwenn was aware of the risk of harm to Wandick yet consciously failed to take reasonable measures to help him.

In reply, defendants contend that Wandick's version of the facts should be disregarded as "wholly unbelievable" and "absurd," Dkt. 45, at 11, 12, because (1) Wandick later told a medical provider that he never asked for help; (2) the corroborating declarations from three other inmates are "conveniently similar" and "look like they were procured to solely attempt to proceed beyond summary judgment," *id.* at 13; and (3) it's undisputed that Schwenn made repeated attempts to contact Wandick before her meeting with him, suggesting her concern for his condition. They cite *Scott v. Harris*, 550 U.S. 372, 380 (2007), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

I'm not persuaded by this argument. I'll start by discussing defendants' assertion that Wandick later admitted that he hadn't asked for help. Defendants argue that Wandick's version of the facts is contradicted by his statement to a medical provider three months after the incident; a medical note states that Wandick recounted the incident by stating in part, "He did not ask for help, rather a staff member found him while trying to hang himself and intervened." Dkt. 31-2, at 10. Wandick doesn't dispute the portion of the statement about not

asking for help, but he says he made that statement "[i]n the context of what happened *after*
Dr. Schwenn and Sergeant Wiersma left him standing at his cell door." Dkt. 33, ¶ 110
(emphasis added). Regardless the true meaning of this statement, the statement doesn't
conclusively disprove Wandick's account in a way that would render a reasonable jury unable
to find in his favor. It is up to the jury to determine what Wandick meant by this statement,
as is an assessment of Wandick's credibility otherwise.

Defendants' criticism of the inmates' declarations as "conveniently similar" and
suspicion that they were created solely to defeat summary judgment are unsupported by any
evidence suggesting that they were fabricated or otherwise created in an attempt to deceive the
court. If what counsel means is that the witnesses' credibility is diminished by the similarity of
the inmates' accounts, counsel well knows that credibility determinations are to be made by a
jury at trial, not by this court at summary judgment. In the future, counsel should refrain from
making this type of credibility argument at summary judgment.

As for other evidence indicating that Schwenn was concerned for Wandick's well-being
rather than disregarding it, it is clear that defendants will be able to produce evidence at trial
that supports their version of the events. But that doesn't mean that I may disregard the
contradictory evidence that Wandick presents. In *Scott*, video evidence conclusively
contradicted one party's version of the events surrounding a high-speed pursuit; the Supreme
Court instructed that the district court shouldn't have credited the witness account that the
video disproved. 550 U.S. at 380. In this case, the video evidence shows Schwenn's earlier,
unsuccessful efforts to meet with Wandick and the later meeting of Schwenn, Wiersma, and
Wandick at the cell. But the video does not reveal what was said in that meeting. And the array

of other evidence presented by the parties does not conclusively disprove Wandick's version of events. Rather, there are genuine disputes of material fact that need to be resolved by the jury.

Defendants also contend that Schwenn is entitled to qualified immunity on this claim. Under the doctrine of qualified immunity, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Defendants contend that it was not clearly established that the care Wandick received was constitutionally deficient. But the Court of Appeals for the Seventh Circuit has warned against applying qualified immunity in Eighth Amendment cases because the merits of those claims and qualified immunity "effectively collapse into one" question in many circumstances. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Because the legal standard for claims like Wandick's is well established and the disputes raised regarding such claims are largely factual rather than legal, "[i]f there are genuine issues of fact concerning th[e] elements [of the claim], a defendant may not avoid trial on the grounds of qualified immunity." *Id.*; *see also Est. of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017) ("Clark's right to be free from deliberate

indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012.").

So Schwenn is not entitled to summary judgment by way of qualified immunity. I will deny defendants' motion for summary judgment regarding Wandick's Eighth Amendment claim against Schwenn.

## B.  Defendant Wiersma

Wandick also brings a claim against defendant Wiersma. I did not specifically grant Wandick leave to proceed on a claim regarding events preceding the meeting at his cell with Schwenn and Wiersma, but Wandick's summary judgment materials suggest that he means to pursue a claim regarding the earlier part of the events. Even if I had granted Wandick leave to proceed on such a claim, Wiersma would be entitled to summary judgment on it. Wandick attempts to dispute whether Wiersma contacted Schwenn after he initially told Wiersma about being suicidal, but he doesn't have personal knowledge of defendants' communications and he doesn't otherwise present any evidence supporting that assertion. The video shows that Schwenn indeed tried to make contact with Wandick after Wandick spoke with Wiersma; the only reasonable inference is that Wiersma sought help for Wandick. And in any event, Wandick didn't harm himself during this period.

That leaves Wiersma's involvement in the evening meeting at Wandick's cell. Defendants argue that Wiersma cannot be liable under the Eighth Amendment because he had to defer to Schwenn's professional medical assessment. *See, e.g.*, *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022) (correctional officer may defer to nurse's medical judgment). This argument again relies on defendants' version of the facts, in which Schwenn made a legitimate medical judgment after speaking with Wandick, who denied feeling suicidal. But if a jury

believed Wandick's version of events, Schwenn didn't make a medical judgment at all, instead she blew Wandick off despite being aware of his repeated expressions of suicidal intent. In such a case, Wiersma couldn't just rely on Schwenn's decision to leave him in his cell facing the risk of suicide. "[C]orrections officers are not constitutionally obligated to override the judgment of medical professionals *unless* they have reason to know that an inmate is receiving inadequate treatment." *Id.* (emphasis added). A reasonable jury could conclude that Wiersma also disregarded the risk to Wandick by failing to do more to address the risk of harm.

Defendants also move for summary judgment on qualified immunity grounds regarding Wiersma. I will reject that argument for the same reasons that I rejected it regarding defendant Schwenn. I will deny defendants' motion for summary judgment regarding Wandick's Eighth Amendment claim against Wiersma. This case will proceed to trial on Wandick's claims against both defendants.

## C. Recruitment of counsel

I previously denied Wandick's motions for recruitment of counsel. Dkt. 9; Dkt. 21. But after receiving more information about Wandick's aphasia in the parties' summary judgment briefing, I conclude that Wandick will need the assistance of counsel to present his case at trial. So on the court's own motion I will attempt to recruit counsel to represent him. The case will be stayed pending recruitment of counsel.

If I find counsel willing to represent Wandick, I will advise the parties of that fact. Soon after, a status conference will be held to set a new schedule. Wandick is advised that the search for counsel may take several months, and there is no guarantee that the court will find counsel willing to represent him.

ORDER

IT IS ORDERED that:

1. Defendants' motion for extension of time, Dkt. 25, is GRANTED.

2. Defendants' motion for summary judgment, Dkt. 26, is DENIED.

3. The case is STAYED pending recruitment of counsel for plaintiff.

Entered February 4, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge